## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

VALERIE SMITH, SHERRIE DENTON,
and JOSH RAGLAND,

      Plaintiffs,

v.                                       No. 2:19-cv-00796-JCH-SMV

THE CITY OF HOBBS, J. GUY, a Hobbs
Police Department Officer, and HAYDEN WALKER,
a Hobbs Police Department Officer,

      Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the City of Hobbs, J. Guy and Hayden Walker's (Defendants) Motion for Summary Judgment Based on Qualified Immunity (ECF No. 20) and Valerie Smith, Sherrie Denton and Josh Ragland's (Plaintiffs) Motion for Partial Summary Judgment on Their Complaint to Recover Damages for Violations of Their Civil Rights (ECF No. 34).

The Court grants summary judgment to Plaintiffs and against Defendant Officer J. Guy on Plaintiffs' allegations that Officer Guy conducted a warrantless search of Plaintiffs' bedroom and unreasonably seized Plaintiff Josh Ragland. In all other respects, summary judgment is granted in Defendants' favor on Plaintiffs' claims that Defendants unlawfully entered Plaintiffs' home; seized Ms. Denton and Ms. Smith; and searched Plaintiffs' home by looking through the front window. Defendants are further entitled to summary judgment on Plaintiffs' *Monell* claim. Plaintiffs will notify the Court whether they intend to pursue summary judgment against Officer Guy on their state law claims as further described below.

I.      **Background**

A. **Factual Background**

Most of the events of this case were recorded from police officers' lapel cameras. Consequently, the Court describes the facts "in the light depicted by the videotape," *Scott v. Harris*, 550 U.S. 372, 381 (2007), while recognizing that any gaps or uncertainties left by the videos are construed in the light most favorable the summary judgment nonmovant. *See Carabajal v. City of Cheyenne, Wyoming*, 847 F.3d 1203, 1207 (10th Cir. 2017). Facts are also provided by a police incident report and other evidence presented.

In November 2017, Hobbs, New Mexico Police Department Officers J. Guy and Hayden Walker were investigating a report of a stolen truck. Defendants' Undisputed Material Fact ¶ 1 (Defs.' UF). The truck was owned by a Texas resident. *Id*. ¶ 2. She told Texas police that her daughter, Sheridan Silipo, or Sheridan's boyfriend, Plaintiff Josh Ragland, stole the truck. *Id*. Texas police contacted Hobbs police and relayed that the truck was at a Hobbs residence owned by Plaintiff Valerie Smith. *Id*. ¶ 3; Defs.' Mot. at 1. Ms. Smith and her daughter, Plaintiff Sherrie Denton, resided together. *Id*.[1] Mr. Ragland is Ms. Denton's son and the grandson of Ms. Smith. *Id*. Texas police also relayed to Hobbs police that Mr. Ragland and Ms. Silipo were the theft suspects. Post-Incident Report, Defs.' Ex. 1, 21 (Post-Incident Report).

Upon arriving at the Smith/Denton residence, Officer Walker observed the truck in the driveway and the truck showed up as stolen in the National Crime Information Center's database. *Id*. Officers Guy and Walker went to Plaintiffs' home and approached the residence. Defs.' UF ¶ 4. Officers knew that Mr. Ragland's bedroom was located on the corner of the house, and Officer Guy told his colleagues that he had been to the house before. Plaintiffs'

---

[1] Defendants filed a newspaper obituary reporting that Ms. Sherrie Denton passed away on May 23, 2020.

Additional Undisputed Material Fact ¶ B (Pls.' AUF), ECF No. 31; Transcript of Excerpt of Officer Walker's Body Cam. 2:5, ECF No. 31-1 (Walker Lapel Tr.).

While Officer Walker went to the front door, Officer Guy took position at the front of the home. Lapel Camera of Officer Guy 1:54, Defs.' Ex. A (Guy Lapel Cam.) Guy faced towards and looked through a window at the front of the home that had semi-transparent curtains. One curtain was partially pulled to the side, clearly revealing the home's interior. Guy positioned himself at the exposed portion of the window.

Meanwhile, Officer Walker knocked, announced his presence, and told Ms. Denton that officers were investigating a crime. Defs.' UF ¶¶ 5-6. Speaking through the closed front door Ms. Denton responded, "we're not dressed." Walker Lapel Tr. 3:3 While Ms. Denton got dressed, Officer Guy continued to stand near the front window and look through it as his lapel camera recorded the home's interior. Pls.' AUF ¶ D. Walker said, "I really need to talk to you," and Ms. Denton asked him "why?" Walker Lapel Tr. 3:4-5, 3:8. He said that he was investigating a crime, to which Ms. Denton responded, "My car?" *Id.* 3:11. "Yes," the officer answered, and Ms. Denton said, "oh, that's not a problem. Hang on a second." *Id.* 3:12-14.

About a minute later, Ms. Denton opened the front door and the exterior storm door and said "come in." *Id.* 3:23; Lapel Camera of Officer Walker 3:54, Defs.' Ex. 3 (Walker Lapel Cam.). She did so to speak with Walker, not as an invitation into the home and video footage shows the two speaking at the threshold for a little over 20 seconds. *Id.* 3:54 – 4:17. During this period Officer Walker asked Ms. Denton her name and the whereabouts of her son, Mr. Ragland. *Id.* After telling Officer Walker that Mr. Ragland was in Texas, Ms. Denton told the officer to "go ahead and come in," and gave Walker permission to enter the vestibule, which he did. Walker Lapel Tr. 4:10, 4:7; Pls.' AUF ¶ I.

As they stood in the vestibule, Officer Walker asked, "is this Josh's room back in here?" Walker Lapel Tr. 4:15-16. Ms. Denton said, "uh-huh," and Officer Walker asked, "Do you mind if I look in there to see if he's here?" *Id*. 4:17-19. Ms. Denton repeated that her son was not at home but that his girlfriend Sheridan Silipo was "back there." *Id*. 4:20-22. Officer Walker said, "do you mind if I – well, I need to talk to Sheridan." *Id*. 4:23-24. Then without waiting for Ms. Denton's answer or permission, the officer walked inside the home. Walker Lapel Cam. 4:37. Officer Walker's body camera was not pointed at Ms. Denton directly during this exchange, so the film does not reveal whether Ms. Denton made a non-verbal gesture for him proceed into the house. However, as he approached a corner, Ms. Denton did say "to the right, hon." Walker Lapel Tr. 5:4. Officer Guy had entered the house as well, and Walker instructed Guy to "move up," meaning to search the rooms. Walker Lapel Tr. 5:7; Pls.' AUF ¶ P.

Officer Walker found Ms. Silipo in a bedroom and began talking to her. Walker Lapel Cam. 5:04. Walker immediately asked her where Mr. Ragland was, and she responded he was "in there" while pointing towards a different room. *Id*. 5:12-5:17; Walker Lapel Tr. 5:10. In response, Officer Guy entered a nearby room, shined his flashlight around, and exited after observing it was vacant. Guy Lapel Cam. 5:35-6:01. He then came back and told Walker that Mr. Ragland was not in the room he had just searched. *Id*. 6:02. Officer Walker again asked Ms. Silipo where Mr. Ragland was and when she last saw him. Walker Lapel Tr. 5:22, 5:24-25. She responded that she saw him "hours ago." *Id*. 6:1. Also during this exchange, Ms. Silipo told Officer Walker that the truck was in the driveway was hers. Pls.' AUF ¶ Q.

Meanwhile, Officer Guy began searching nearby rooms by shining his flashlight within them. Guy Lapel Cam. 5:38 – 6:27. Guy then encountered Ms. Denton in the hallway. *Id*. 6:41. Nearby was a darkened room with the door open. Guy indicated towards the room and asked,

"Josh isn't in here?" *Id*. 6:40 – 43; Transcript of Excerpt of Officer Guy's Body Cam. 4:20 (Guy Lapel Tr.). Ms. Denton said, "No. That's my mother's room." *Id*. 4:21. Officer Guy advanced towards the room. Guy Lapel Cam. 6:45. As he did so, Ms. Denton said, "please don't go in there." Guy Lapel Tr. 4:22. Officer Guy went into the room anyway, telling Ms. Denton that he was "going to make sure Josh [was not] hiding in [t]here." *Id*. 4:23-24.

Officer Guy quickly found Mr. Ragland hiding and placed him in handcuffs. Guy Lapel Cam. 6:46 – 7:25. At this point, Ms. Denton and Officer Walker also entered Ms. Smith's bedroom. Walker Lapel Cam. 7:00. Officer Walker told Ms. Denton that she had lied about Mr. Ragland's whereabouts and ordered her to go to the living room. Walker Lapel Tr. 7:3-6. Ms. Denton did not immediately comply, so Officer Walker told her, "do you want to go in handcuffs?" *Id*. 7:6-7. Ms. Denton "questioned … Walker['s authority]" Pls.' AUF ¶ U, by telling Walker "you want to take a 70 year old woman to," at which point Walker interrupted her and said "are you testing me?" Walker Lapel Tr. 7:9-11. Officer Walker and Ms. Denton then spoke over each other, with the officer telling her she was "an accessory" and Ms. Denton, in a raised voice, telling another officer to get his "damn hands off" of her as he escorted her out of the bedroom. *Id*. 7:18; 8:3. As for Mr. Ragland, he remained handcuffed and was not free to leave while Defendants questioned him about the truck. Pls.' AUF ¶ X. Neither Plaintiffs nor Ms. Silipo had weapons on them. *Id*. ¶ GG.

After these events, other Hobbs police officers came on the scene and entered the Smith/Denton residence, including Officer Faulkner, who took over the investigation. Post-Incident Report at 21. Officers remained in the house while they investigated the theft report and interviewed Mr. Ragland, Ms. Silipo, and Ms. Denton. Ms. Denton and Ms. Smith never gave officers consent to enter the home. Pls.' AUF ¶ Y. Nor did Ms. Denton or her mother consent to

officers remaining in their home while they conducted their investigation. Plaintiffs' Undisputed Material Fact ¶ 32 (Pls' UF).

During officers' interview with Ms. Silipo, she said that her mother in Texas reported the vehicle stolen out of mother-daughter strife. *See generally* Walker Lapel Cam. 8:46-9:30. In the "narrative" section of his report, Officer Faulkner wrote that Ms. Silipo "stated [that Mr. Ragland] had nothing to do with t[he] incident." Post-Incident Report at 20. The officers' Texas counterparts also informed them that Ms. Silipo's mother gave her permission to drive the truck. *Id*. Based on this information, Officer Faulkner declined to pursue charges since Ms. Silipo had permission to use the truck. *Id*.

However, during the investigation, officers discovered that Ms. Silipo and Mr. Ragland both had outstanding warrants. Officers arrested Mr. Ragland at some point in the investigation after they discovered the warrant, which they were initially unaware of when they encountered him. Pls.' AUF ¶¶ EE, FF. Ms. Silipo and Mr. Ragland were eventually transported to Hobbs City Jail for booking. Faulkner Narrative at 21. All officers left the Smith/Denton residence at 9:48 p.m., about 45-minutes after they first arrived. Pls.' UF ¶ 36.[2]

**B. Procedural Background**

On August 30, 2019, Plaintiffs filed a federal complaint that asserted the following claims for relief brought under 42 U.S.C. § 1983: a violation of Ms. Denton and Ms. Smith's Fourth Amendment right to be free from an unreasonable searches stemming from Officer Guy's act of "peering into … and recording the interior of their home." Compl. ¶ 41 (Count 1); a violation of Plaintiffs' Fourth Amendment rights to be free from unreasonable searches in their home (Count 2); a violation of Ms. Smith and Mr. Ragland's Fourth Amendment rights to be free

---

[2] According to Plaintiffs, Officers Guy and Walker went to the Smith/Denton residence at 9:02 p.m.

from unreasonable seizures (Count 3); a violation of Plaintiffs' Fourth Amendment rights stemming from officers' "unlawful occupation of [their] home," by "remaining in their home to conduct a criminal investigation." Compl. at 6; ¶ 60 (Count 4); a municipal liability claim against the City of Hobbs for maintaining a "custom or policy of violating Fourth Amendment rights of its residents through repeated entries into homes when [police officers] have no warrant, no exigencies exist and they have no consent to enter." *Id.*  ¶ 62 (Count 5). In addition, Plaintiffs asserted and a cause of action under the New Mexico Tort Claims Act's waiver of immunity found at N.M. Stat. Ann. § 41-4-12 for Defendants' alleged "deprivation of [Plaintiffs'] state and federal constitutional rights." Compl. ¶ 66 (Count 6).

On February 2, 2020, Defendants moved for summary judgment on "all counts" based on qualified immunity. ECF No. 20 at 17. Defendants argued that qualified immunity applies because (1) probable cause existed to conduct the investigation into the truck, (2) Ms. Denton consented to the warrantless entry and search, (3) the scope of the in-home detention and investigation was reasonable, and (4) officers arrested Mr. Ragland lawfully pursuant to a warrant. Without any underlying constitutional injuries, Defendants also contend that Plaintiffs' municipal liability against the City of Hobbs and their state-law claim necessarily failed. [3]

On August 14, 2020, Plaintiffs moved for partial summary judgment in their favor on Counts 2-4 of their complaint. They specifically sought judgment that (1) Ms. Denton "clearly revoked any consent to search her mother's bedroom when she told Guy not to go [in there]," and (2) that "Guy and Walker's detention of Denton, Smith and Ragland in the home and their

---

[3] In lieu of responding to Defendants' summary judgment motion, Plaintiffs moved the Court under Fed. R. Civ. P. 56(d) to deny or defer ruling on Defendants' motion and requested time for additional discovery. The Court denied their request and ordered Plaintiffs to respond, which they did in May 2020.

continued presence in the home to conduct their investigation deprived the residents of their Fourth Amendment rights." ECF No. 34 at 3.

## II.     Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). In reviewing a summary judgment motion based on qualified immunity, the court views the evidence "in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam) (citation omitted). "Because of the underlying purposes of qualified immunity, [the Tenth Circuit] review[s] summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). That burden requires a plaintiff to show that the state official "(1) [] violated a federal statutory or constitutional right, and (2) the unlawfulness of [the official's] conduct was clearly established at the time." *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 589 (2018) (internal quotations and citations omitted). "[The district court] may decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case.'" *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Pearson v. Callahan,* 555 U.S. 223, 236 (2009)). "[I]f the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense." *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016).

In analyzing cross-motions for summary judgment, a court "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 906–07 (10th Cir. 2016). "Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007). If the moving party bears the burden of proof on its claims at trial, it must first affirmatively show that, on all the essential elements of his claims, no reasonable jury could find for the nonmovant. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J. dissenting). "Summary judgment in favor of the party with the burden of persuasion ... is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Hunt v. Cromartie,* 526 U.S. 541, 553 (1999)). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Leone*, 810 F.3d at 1153 (citation and quotations omitted).

## III.   Discussion

The Fourth Amendment provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause ...." U.S. Const. amend. IV. There are "three types of police/citizen encounters: consensual encounters, investigative stops, and arrests." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc) (citation and quotations omitted). Consensual encounters are not Fourth Amendment seizures. *Id*. "Both arrests and investigatory stops, however, are seizures under the Fourth Amendment." *United*

*States v. Reeves*, 524 F.3d 1161, 1166 (10th Cir. 2008) (citing *Terry v. Ohio,* 392 U.S. 1, 16–19 (1968)).

"[T]here are 'strict limits' on when law enforcement officers may reasonably (and thus lawfully) enter a home without a warrant." *United States v. Martin*, 613 F.3d 1295, 1299 (10th Cir. 2010). In *Payton v. New York*, 445 U.S. 573, 576 (1980), the Supreme Court held that, absent exigent circumstances, police officers may not enter an individual's home to make a nonconsensual warrantless seizure, even with probable cause. "In terms that apply equally to [searches for] property and seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonable be crossed without a warrant." *Id*. at 590. "*Payton*'s protections apply to all Fourth Amendment seizures of persons inside their homes." *Reeves*, 524 F.3d at 1166. Consequently, "labeling an encounter in the home as either an investigatory stop or an arrest is meaningless because *Payton*'s requirements apply to all seizures." *Id*.

### A. The officers' initial entry and search for Ms. Silipo

Plaintiffs argue that officers entered the Smith/Denton residence without a warrant and in violation of the Fourth Amendment. Defendants claim that Ms. Denton voluntarily opened her door to officers and let them enter the home to speak with Ms. Silipo. As noted earlier, consensual police-citizen encounters "do[ ] not require a warrant because [they are] not a search or seizure for Fourth Amendment purposes." *Manzanares v. Higdon*, 575 F.3d 1135, 1143 (10th Cir. 2009) (citing *Cortez,* 478 F.3d at 1115). "Such encounters are limited by the scope of consent given." *Id*. (citing *Gates v. Tex. Dep't of Protective & Regulatory Servs.,* 537 F.3d 404, 426 (5th Cir. 2008)). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable

10

person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno,* 500 U.S. 248, 251 (1991). "The scope of the consent to search is limited by the breadth of the consent given." *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000) (citing *United States v. Pena,* 920 F.2d 1509, 1514 (10th Cir. 1990)). Notably, a person's "failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent." *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999) (citations omitted).

Applying these rules, no reasonable jury could conclude that Ms. Denton limited her consent to the vestibule as Plaintiffs claim. Ms. Denton told Officer Walker to "come in," and volunteered that Ms. Silipo was in a part of the house "back there." Even though Officer Walker said he needed to talk to Ms. Silipo and then proceed without waiting for Ms. Denton's response, Ms. Denton did not object to his further intrusion into the home. She instead affirmatively told him "to the right, hon," as he approached a corner in the hallway. A reasonable person would have understood the exchange as consent to search rooms that Ms. Denton indicated to until officers found Ms. Silipo. *See United States v. Wacker*, 72 F.3d 1453, 1470 (10th Cir. 1995) (holding that defendant consented to search of the rear of his truck where the defendant "placed no limits on the search," and did not "later object when the search extended to the bed of the truck."); *see also United States v. Mains,* 33 F.3d 1222, 1227 (10th Cir. 1994) (holding that the defendant's consent to a search of his apartment for another person extended to the search of any area large enough to accommodate that individual). Defendants have carried their summary judgment burden to show that Ms. Denton voluntarily opened the door to officers and consented to their search for Ms. Silipo.

### B. Officer Guy's entry into Ms. Smith's bedroom

Plaintiffs' evidence does show, however, that Ms. Denton limited the scope of the search when she told Officer Guy not to enter her mother's bedroom. *See Manzanares*, 575 F.3d at 1143 ("[C]onsent which waives Fourth Amendment rights may be limited, qualified, or withdrawn.") (quoting *Gates,* 537 F.3d at 426) (alteration in original)); *United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005) ("Once given, consent to search may be withdrawn[.]"); *United States v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006) ("A suspect is free, … after initially giving consent, to delimit or withdraw his or her consent at anytime.") Ms. Denton unequivocally told Officer Guy, "please don't go in there." Despite this limitation placed on the scope of the search, Officer Guy nevertheless entered Ms. Smith's bedroom. Although the bedroom belonged to Ms. Smith, Defendants do not attack Ms. Denton or Mr. Ragland's standing to challenge the search of the bedroom. Thus, to justify his further intrusion into the bedroom after consent was limited, Officer Guy was required to have a valid exception to the warrant requirement. *See Manzanares*, 575 F.3d at 1146; *id*. at 1143 ("Th[e] search should have terminated instantly upon [defendant's] revocation of consent, and the officers should have promptly departed the premises (assuming they possessed no independent legal authority to remain).") (citation omitted) (first alteration in original).

Defendants argue that two independent legal grounds existed to extend the search. First, they claim that probable cause existed to "seek[ ] out the suspects," Mr. Ragland and Ms. Silipo. ECF No. 20 at 12. Second, they claim that Officer Guy conducted a permissible protective sweep of the room. The Court analyzes each theory.

"An officer has probable cause to arrest if, under the totality of the circumstances, he learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person

arrested." *United States v. Munoz-Nava*, 524 F.3d 1137, 1144 (10th Cir. 2008) (quoting *United States v. Brooks,* 438 F.3d 1231, 1241 (10th Cir. 2006)). Defendants are correct that officers likely had probable cause to believe that Mr. Ragland was within the bedroom. Officers had received a report that a Dodge Ram was stolen, that Ms. Silipo and Mr. Ragland were the culprits, and that the truck was probably at the Smith/Denton home. In the driveway of the Smith/Denton home was a Dodge Ram that was reported stolen in the NCIC database. Moreover, officers had just spoken with one of the suspects, Ms. Silipo, who had said merely that she possessed the truck – not that her possession was lawful – and indicated that the second suspect was in a nearby room.

But probable cause alone was insufficient to justify the entry into Ms. Smith's room. The moment that Ms. Denton limited the search, "police officers need[ed] either a warrant or probable cause *plus exigent circumstances* in order to make a lawful entry into a home." *Kirk v. Louisiana,* 536 U.S. 635, 638 (2002) (emphasis added); *United States v. Flowers*, 336 F.3d 1222 (10th Cir. 2003); *United States v. Maez*, 872 F.2d 1444, 1451, 1452 (10th Cir. 1989) ("Emergency conditions may make a warrantless search or arrest constitutional where probable cause exists," and therefore "if exigent circumstances exist, the constitutional bar against a suspect's arrest in his home without a warrant does not apply.") (citations omitted).

Defendants seek to justify the warrantless search of Ms. Smith's bedroom based on the risk of danger to police officers, which is a recognized exigent circumstance justifying a warrantless seizure. *See United States v. Thomas*, 372 F.3d 1173, 1177 (10th Cir. 2004); *United States v. Gay*, 240 F.3d 1222, 1228 (10th Cir. 2001). For Defendants to rely successfully upon that exception to the Fourth Amendment's warrant requirement, they "must show that there was a risk of serious physical injury posed to the officers or others that required swift action." *Cortez*,

478 F.3d at 1124. "[T]o demonstrate that officer safety concerns qualify as exigent circumstances permitting entry into a home without a warrant, the government must show '(1) the officers had an objectively reasonable basis to believe that there was an immediate need to enter to protect the safety of themselves ... and (2) the conduct of the entry was reasonable.'" *Martin*, 613 F.3d at 1303 (quoting *Reeves*, 524 F.3d at 1169). In § 1983 warrantless search and arrest actions, the Tenth Circuit places on police officers the burden of proving exigent circumstances. *See Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1070 (10th Cir. 2010).

Although Defendants emphasize that Ms. Silipo and Mr. Ragland were auto theft suspects and that Mr. Ragland's presence in the house was unknown, Defendants identify no disputed facts concerning exigency. For instance, there is no record evidence that Mr. Ragland and Ms. Silipo's alleged auto theft involved violence or that the two were armed and dangerous. Nor is there evidence that any Smith/Denton household members had a known reputation for violence. While it is true that officers were given inconsistent answers about Mr. Ragland's whereabouts, there is no evidence that Mr. Ragland was dangerous or that the officer had to enter the room as a result.

The record instead indicates that Ms. Denton courteously invited officers inside and then told Officer Walker that Ms. Silipo was in a back bedroom in response to his question. When officers encountered Ms. Silipo, she was asleep, had no weapons, and "fully cooperated" with instructions. Defs.' UF ¶ 13. Ms. Denton and her mother freely moved about the house and there is no indication that officers felt the need to draw their weapons or saw dangerous items or persons in plain view. The trier of fact therefore could not conclude that Defendants' evidence supports a "plausible claim of specially pressing or urgent law enforcement need," to justify the

warrantless search based on exigent circumstances. *Illinois v. McArthur,* 531 U.S. 326, 331 (2001).

Defendants next argue that Officer Guy performed a lawful protective sweep of the bedroom based on officer safety. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). "This type of search is limited to a 'cursory visual inspection of those places in which a person might be hiding.'" *United States v. Banks*, 884 F.3d 998, 1013 (10th Cir. 2018) (quoting *Buie*, 494 U.S. at 327). *Maryland v. Buie* "allow[s] protective sweeps in two situations." *United States v. Bagley*, 877 F.3d 1151, 1153 (10th Cir. 2017). "In the first situation, authorities can look in 'closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.'" *Id.* (quoting *Buie*, 494 U.S. at 334). "In the second situation, authorities can look elsewhere in the house upon specific, articulable facts supporting a reasonable belief that someone dangerous remains in the house." *Id.* at 1153-54. "[T]he sweep must last 'no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.'" *Walker v. City of Orem*, 451 F.3d 1139, 1150 (10th Cir. 2006) (quoting *Buie*, 494 U.S. at 335–36).

Officer Guy's search of the bedroom was not of the first sort authorized by *Buie*. The justification for permitting a suspicionless search of "spaces immediately adjoining the place of arrest" is the danger inherent in taking a person into custody in a home. *Buie*, 494 U.S. at 333-34. Here, Mr. Ragland was not arrested before the search. A protective sweep, even one based solely on officer safety, generally does not extend to non-arrest situations. *See United States v. Porter*, 594 F.3d 1251, 1256 (10th Cir. 2010) ("A protective sweep based solely on the safety of law

enforcement officers may be conducted 'only incident to an arrest.'") (quoting *United States v. Walker*, 474 F.3d 1249, 1254 (10th Cir. 2007)). Moreover, the officer's search was not of closets and spaces in "the immediate vicinity of the arrest." *Bagley*, 877 F.3d at 1155 (quoting *Vale v. Louisiana*, 399 U.S. 30, 33 (1970)) (internal quotation mark omitted). Rather, the search was for Mr. Ragland.

While it is true that "a search may precede an arrest and still be incident to that arrest," *United States v. Torres-Castro*, 470 F.3d 992, 997 (10th Cir. 2006), this presupposes that officers are lawfully present at the place searched. In *Buie* itself officers were lawfully executing an arrest warrant in the home. Therefore, the Supreme Court laid out the types of searches that could be performed during an in-home arrest and the factors for assessing the reasonableness of such searches mentioned *supra* - that the search be performed for officer safety; the necessity of articulable facts suggesting danger; limiting the search to a cursory visual inspection of those places that could hide a person, etc. *Buie,* 494 U.S. at 333-36. These justifications do not support Officer Guy's search given that officers had neither a search warrant nor an arrest warrant, Ms. Denton unequivocally told Officer Guy not to enter the room, nothing was in plain view and no exigent circumstances existed.

A reasonable jury also could not conclude that the sweep fit within the second situation authorized by *Buie*. While Ms. Silipo's statements indicated that Mr. Ragland was in the house, there still must be specific and articulable facts supporting an objective belief that Mr. Ragland presented a danger to officers' safety such that it was necessary for them to enter the room. *See Bagley*, 877 F.3d at 1156. Defendants simply say that Mr. Ragland was a felony suspect who posed a danger to officers. But Defendants have cited no authority suggesting that auto theft suspects are frequently armed and dangerous. Without more, such a generalization that Mr.

Ragland was a crime suspect is insufficient to justify a protective sweep. *Cf. Buie,* 494 U.S. at 334 n. 2 ("[e]ven in high crime areas, where the possibility that any given individual is armed is significant, ... reasonable, individualized suspicion [is required] before a [protective sweep] can be conducted").

Defendants' generalizations therefore fall well short of caselaw illustrating the type of specific, articulable facts suggesting that a dangerous third-person person could be on the scene. *See, e.g., United States v. Denson*, 775 F.3d 1214, 1219 (10th Cir. 2014) (upholding protective sweep of home where officers knew the defendant was a fugitive gangster who had a history of violent crime and that a second person lived in the home who was wanted on an outstanding warrant); *Torres-Castro,* 470 F.3d at 998–99 (upholding protective sweep where police officers "observed several individuals retreat into the back rooms of the house as they approached," and the officers "had information that [the defendant] possessed a weapon and had threatened to use it[.]") Absent specific and articulable facts that Mr. Ragland was dangerous, his unknown presence in the house did not justify a sweep. "[T]here could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course...." *United States v. Carter*, 360 F.3d 1235, 1242-43 (10th Cir. 2004).

In summary, the undisputed facts show that Officer Guy did not perform a lawful protective sweep of Ms. Smith's room. Nor was he authorized by warrant, exigent circumstances, or consent to enter the room. It follows that Mr. Ragland was "seized" within the meaning of the Fourth Amendment when Officer Guy apprehended him. *See Reeves*, 524 F.3d at 1167 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have

believed that he was not free to leave." (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). The record demonstrates that almost as soon as Officer Guy encountered Mr. Ragland, he commanded him in an authoritative voice to "turn around" so that the officer could handcuff Mr. Ragland. A reasonable person faced with this command would not feel free to ignore Officer Guy's order. Characterizing this encounter as an investigative stop under *Terry* is foreclosed. *See id.* at 1166 ("labeling an encounter in the home as either an investigatory stop or an arrest is meaningless because *Payton*'s requirements apply to all seizures.") As a result, Mr. Ragland was seized in the bedroom that Officer Guy had no authority to enter.

Having determined that Plaintiffs have met their burden on the first prong of the qualified immunity analysis, the Court next determines whether Officer Guy violated clearly established Fourth Amendment rights. Plaintiffs rely heavily on the Tenth Circuit's case *Manzanares v. Higdon*, 575 F.3d 1135 (10th Cir. 2009). Like here, the plaintiff in *Manzanares* voluntarily opened his door to the police but was later seized after police refused his request for them to leave his home. *Id.* at 1140, 1143. The Tenth Circuit explained that "*Payton*'s requirements apply to all [in-home warrantless] seizures," and that the officers' continued presence in the plaintiff's home after he asked them to leave was permitted only if officers had a warrant or a valid exception to the warrant requirement. *Id.* at 1144. Lacking both, the Tenth Circuit held that "[i]t has been clear for nearly thirty years that a warrantless entry into a home is presumptively unreasonable." *Id.* at 1146. The Court agrees that *Manzanares* governs this case.

Defendants try to distinguish *Manzanares* by arguing that Manzanares was a witness, not a suspect to a crime, whereas Defendants had probable cause to believe that Mr. Ragland and Ms. Silipo were criminal suspects and could be found at the Smith/Denton residence. But this distinction is not dispositive. Even if officers had probable cause to believe that Mr. Ragland was

in the room, they still required exigent circumstances in order to make a lawful warrantless entry. *See Payton*, 445 U.S. 573 at 590; *Kirk,* 536 U.S. at 638; *Reeves*, 524 F.3d at 1169. Because this indispensable requirement is missing, Officer Guy violated Plaintiffs' clearly established constitutional rights by entering the room after consent was withdrawn and without exigent circumstances.

It was also clearly established that "protective sweeps must be performed incident to an arrest." *Torres–Castro,* 470 F.3d at 997. Even assuming that a protective sweep may be permissible under circumstances other than the execution of an in-home arrest, it was clearly established that Officer Guy needed specific and articulable facts establishing that there was someone hiding in the room who posed a danger to officers to enter. *See Buie*, 494 U.S. at 334. In the absence of "articulable facts ... warrant[ing] a reasonably prudent officer in believing that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene," *id.*, Officer Guy's search of Ms. Smith's room violated Plaintiffs' clearly established right to be free from unreasonable searches.

Plaintiffs are therefore entitled to summary judgment on their allegations in their complaint that Officer Guy conducted a warrantless search of Ms. Smith's bedroom. Plaintiffs are also entitled to summary judgment on their claim that Mr. Ragland's resulting detention was "an unreasonable seizure." Compl. ¶ 57.

### C. Officer Walker's order to Ms. Denton to exit the bedroom

Ms. Denton asserts that she was seized when Officer Walker ordered her to exit the bedroom. In order to "seize" a person, a law enforcement officer must restrain that person's liberty by means of either "physical force" or a "show of authority." *Terry,* 392 U.S. at 19, n. 16. Although Officer Walker threatened to handcuff Ms. Denton and allegedly grabbed her wrist, it

was Ms. Denton who, in a raised voice, told officers to get their hands off her, which they did. Ms. Denton then walked out of the bedroom. Another officer ushered her out as she did so, but there is no indication that officers employed force, drew weapons, or placed Ms. Denton in handcuffs. The record overall does not demonstrate that officers' conduct "would suggest to a reasonable person that he or she was barred from leaving the [home] or otherwise terminating the encounter." *United States v. Drayton*, 536 U.S. 194, 204 (2002); *California v. Hodari D.,* 499 U.S. 621, 627-28 (1991) (a person is "seized" within the meaning of the Fourth Amendment only where "the officer's words and actions" would convey to an objectively reasonable person that his or her freedom of movement is being restricted.) To the extent that the Fourth Amendment claims asserted against Defendants are premised on a belief that they "seized" Ms. Denton in her mother's bedroom, Defendants are entitled to summary judgment. The claims premised on Officer Guy's entry into the bedroom remain viable only to the extent that they are based on allegations that Officer Guy unreasonably "searched" the room after Ms. Denton limited her consent and it had become apparent that Mr. Ragland posed no risk of danger to officers.

### D. Remaining in the home

Defendants are entitled to summary judgment on Plaintiffs' allegation that Defendants committed a Fourth Amendment violation when other responding Hobbs police officers entered the home and "'round[ed] up' … the occupants … into the living room for a police investigation." ECF No. 34 at 3; *see* Compl. ¶¶ 59-60. Once Mses. Denton, Smith and Silipo were in the living room, no officer threatened, physically touched them or placed them in handcuffs. There is no indication that an officer brandished his weapon. Officers spoke with them in a nonconfrontational, conversational tone of voice and Plaintiffs never told officers that they wished to end the conversation. A reasonable jury could not conclude that Plaintiffs "w[ere]

barred from leaving the [home] or otherwise terminating the encounter." *Drayton,* 536 U.S. at 204. Given that the Plaintiffs were questioned inside of their own home, they may have felt a need to remain in the area "for reasons unrelated to the police presence." *Brendlin v. California,* 551 U.S. 249, 255 (2007). However, a reasonable jury could not conclude that "the circumstances of the encounter [we]re so intimidating" that a reasonable person would have believed that she "was not free to leave." *INS v. Delgado,* 466 U.S. 210, 216 (1984). Moreover, Plaintiffs never objected to additional officers' entry or presence in the home and thus consented to additional officers entering the home.

### E. Officer Guy's act of looking through the window

Plaintiffs seek nominal damages, attorneys' fees and a declaration that Officer Guy "deprived [Ms. Denton and Ms. Smith] of their reasonable expectation of privacy in their home by peering into their home and recording the interior," when officers first approached the home. Compl. ¶ 41. The area "immediately surrounding and associated with the home," otherwise referred to as "curtilage" is regarded as "part of the home itself for Fourth Amendment purposes." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). "The front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" *Id.* at 7. The Supreme Court has explained that there is an implicit license for a visitor to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at 8. Therefore, officers without a warrant "may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Id.* (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). This is commonly referred to as a "knock and talk." *United States v. Carloss*, 818 F.3d 988, 992 (10th Cir. 2016).

However, "[t]he scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose." *Jardines*, 569 U.S. at 9. In *Jardines*, the officers' "introduc[tion of] a trained police dog to explore the area around the home in hopes of discovering incriminating evidence," exceeded the implicit license. *Id.*; *see id.* (stating that, for a home's occupant "[t]o find a visitor knocking on the door is routine," but that "to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission," would exceed an implicit license to approach the front door and conduct a knock and talk.). Thus, under *Jardines*, a physical intrusion into the curtilage to obtain information is a search, unless permitted by a license. *Id.* at 7-9.[4]

The Plaintiffs rely on one case only, *Jardines*, in support of their arguments. The Court therefore proceeds directly to the qualified immunity prong and asks whether *Jardines* would have placed Officer Guy on notice that the alleged unlawfulness of his conduct was "beyond debate." *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (citation omitted). It would not have. The precise issue in *Jardines* was whether the police's on-curtilage drug-detection dog to sniff at the front door was a search. Here, Officer Guy's conduct was much more ambiguous. He stood on or near a pathway in front of the house, which is "a semi-private area on which police may set foot," and he looked into a window that already exposed the home's interior to public

---

[4] In *Jardines*, the Court held that the officers' use of the drug-sniffing on the home's porch was a trespass that constituted a Fourth Amendment search. In addition to the trespassory framework described in *Jardines*, a search also occurs whenever the government intrudes upon any place in which a person has a "reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). *Jardines* explained that *Katz*'s "reasonable expectations test" "has been added to, not substituted for, the traditional property-based understanding of the Fourth Amendment." *Jardines*, 569 U.S. at 11. Here, Plaintiffs mention the words "reasonable expectation of privacy," ECF No. 31 at 18, 19, but they analogize their case to *Jardines*. Following Plaintiffs' lead, the Court analyzes Officer Guy's actions under *Jardines*' trespassory test rather than *Katz*'s reasonable expectations test.

view because it was nighttime and the curtain was partially open. *United States v. Shuck*, 713 F.3d 563, 567 (10th Cir. 2013). Clearly established law holds that which a person knowingly exposes to public view is not subject to Fourth Amendment protections. *See California v. Ciraolo,* 476 U.S. 207, 213 (1986). Although "an officer's leave to gather information is sharply circumscribed when he" is on the curtilage, Officer Guy's conduct was unlike the officers in *Jardines* who "were gathering information" and "learned what they learned only by physically intruding on Jardines' property to gather evidence." *Jardines*, 569 U.S. at 5, 7, 11. The reasoning in *Jardines* is not limited to the specific facts of bringing a drug-sniffing dog to the front porch. But *Jardines* would not have apprised Officer Guy that his conduct exceeded any license and therefore violated a clearly established Fourth Amendment right.

### F. Municipal Liability

The City of Hobbs is a "'person[ ]' subject to § 1983 liability." *Donahue v. Wihongi*, 948 F.3d 1177, 1199 (10th Cir. 2020) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). "To sustain a municipal liability claim for § 1983 violations, the plaintiff must show: (1) the existence of a municipal custom or policy; (2) a direct causal link between the custom or policy and the violation alleged, and (3) deliberate indifference on the part of the municipality." *Colbruno v. Diggins*, No. 17-CV-01072-WYD-MJW, 2018 WL 10215848, at *9 (D. Colo. Jan. 31, 2018) (citing *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). A policy or custom for § 1983 municipal-liability purposes may take the following forms:

 (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to

adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283–84 (10th Cir. 2019) (citation omitted).

Plaintiffs seek to establish a policy based on categories two and five. They identify three other instances occurring between 2018 and 2019 where City officers apparently entered citizens' homes without a warrant, exigent circumstances, or consent. Plaintiffs allege that these incidents amount to "a practice, custom or policy or are a result of deliberate indifference to training needs" of officers. Compl. at ¶ 64.

Plaintiffs' allegations fail for lack of proof. They produced no offense reports of these three incidents, much less expert witness evidence about whether these three incidents amounted to a widespread policy or custom of violations. All the Court has before it are Plaintiffs' barebone allegations, which are not competent summary judgment evidence. Lacking proof, Plaintiffs have failed to create a triable issue of fact regarding a pattern of conduct. Also problematic is that the three incidents occurred after the events in question and therefore could not have put Hobbs on notice that it acted with deliberate indifference to a risk that was known or obvious to the City at that time. *See Waller*, 932 F.3d at 1286 ("Incidents that occurred subsequent to the incident at issue in this case cannot have provided Denver with notice of a deficiency in its training program before that incident."); *id*. at 1287 ("deliberate indifference generally requires 'proof of a *pre-existing* pattern of violations'") (quoting *Connick v. Thompson*, 563 U.S. 51, 62, (2011)). Deliberate indifference is a "stringent standard of fault," *id*. at 1284, and these subsequent incidents therefore cannot be the basis of a claim that Hobbs disregarded a known pattern of tortious conduct. Defendants are therefore entitled to summary judgment on Plaintiffs' *Monell* claim against Hobbs.

### G. State law claims

"The NMTCA preserves sovereign immunity against tort claims for state governmental entities and public employees acting in the scope of their duties, except as specifically waived." *Fernandez v. Mora-San Miguel Elec. Co-op., Inc.*, 462 F.3d 1244, 1250 (10th Cir. 2006) (citing N.M. Stat. Ann. § 41-4-4)). Section 41-4-12 provides that law enforcement officers' immunity is waived for "any other deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties." N.M. Stat. Ann. § 41-4-12. "To claim an intentional tort against a public employee, 'a plaintiff must demonstrate that the defendant [was a] law enforcement officer[ ] acting within the scope of their duties, and that the plaintiff's injuries arose out of either a tort enumerated in [the NMTCA] or a deprivation of a right secured by law.'" *Garcia v. Martinez*, 414 F. Supp. 3d 1348, 1357 (D.N.M. 2019) (quoting *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't*, 1996-NMSC-021, ¶ 7, 121 N.M. 646, 649, 916 P.2d 1313, 1316).

To the extent that Plaintiffs assert that the New Mexico has waived immunity for the City of Hobbs, Defendants are granted summary judgment on such a claim. As discussed earlier, the Plaintiff have failed to establish a constitutional violation against Hobbs. Moreover, they fail to explain whether the NMTCA's waiver of immunity would even extend to a municipality in these circumstances. Plaintiffs' evidence also fails to establish that Officer Walker committed a constitutional violation. Accordingly, summary judgment is granted to Hobbs and Officer Walker on Plaintiffs' NMTCA claims.

Concerning liability against Officer Guy, however, the Court has already concluded that a reasonable jury evaluating Plaintiffs' evidence would be compelled to find that Plaintiffs' rights were violated when Officer Guy entered the bedroom without a warrant or exception to the

warrant requirement after Ms. Denton limited her consent, resulting in Mr. Ragland's unlawful seizure. New Mexico waives immunity for Plaintiffs' constitutional injuries caused by Officer Guy. But Plaintiffs did not move for summary judgment on their state law tort claims and the parties' briefing on the issue is cursory. Within ten days of entry of this Memorandum Opinion and Order, Plaintiffs must file a notice with the Court setting forth whether they intend to pursue a summary judgment against Officer Guy on their state law claims. Should Plaintiffs wish to submit a dispositive motion on the merits of the state law claims only, any such motion must be filed within 21 days of the filing of Plaintiffs' notice.

## IV.   Conclusion

**IT IS THEREFORE ORDERED that** the parties' cross-motions for summary judgment **(ECF Nos. 20 & 34)** on Plaintiffs' allegations that Defendant Officer J. Guy conducted a warrantless search of Plaintiffs' bedroom and unreasonably seized Plaintiff Josh Ragland is **GRANTED** in Plaintiffs' favor and against Officer Guy only. In all other respects, summary judgment is granted in Defendants' favor on Plaintiffs' claims that Defendants unlawfully entered Plaintiffs' home; seized Ms. Denton and Ms. Smith; and searched Plaintiffs' home by looking through the front window. Defendants are further entitled to summary judgment on Plaintiffs' *Monell* claim.

**IT IS FURTHER ORDERED that** within ten days of entry of this Memorandum Opinion and Order, Plaintiffs will notify the Court whether they intend to pursue a summary judgment against Officer Guy on their state law claims. Should Plaintiffs wish to submit a dispositive motion on the merits of the state law claims only, any such motion must be filed within 21 days of the filing of Plaintiffs' notice.

**IT IS FINALLY ORDERED that** all of Plaintiffs' claims against Defendants the City of Hobbs and Officer Hayden Walker are **dismissed with prejudice**.


_____
SENIOR UNITED STATES DISTRICT JUDGE